**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SERVICE EMPLOYEES
INTERNATIONAL UNION NATIONAL
INDUSTRY PENSION FUND, *et al.*,

     *Plaintiffs*,

    v.

HAMILTON PARK OPCO, LLC d/b/a
ALARIS HEALTH AT HAMILTON PARK,

     *Defendant.*

Civil Action No. 19-1737 (RDM)

## MEMORANDUM OPINION

Plaintiffs Service Employees International Union National Industry Pension Fund, a

multiemployer employee pension plan, and its Trustees (collectively, the "Fund") bring this suit

against Defendant Hamilton Park OPCO, LLC, d/b/a Alaris Health at Hamilton Park ("Hamilton

Park").  Plaintiffs allege that Hamilton Park failed to comply with its obligations under the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, as

amended by the Pension Protection Act of 2006 and the Multiemployer Pension Reform Act of

2014, to make supplemental contributions to the Fund pursuant to the Collective Bargaining

Agreement ("CBA") between the Service Employees International Union Local 1199 United

Health Care Workers East (the "Union") and Hamilton Park.  *See* Dkt. 55-2 at 4.

The Fund has now moved for summary judgment, seeking over $800,000 in unpaid

contributions, liquidated damages, and interest.  Dkt. 55.  Hamilton Park opposes that motion on

only two limited grounds:  It argues that the Fund's damages calculations improperly include

"probationary employees" and that a factual dispute exists regarding the contribution rate for the

period from July 1, 2015, through December 31, 2016.  Dkt. 58 at 5, 7.  The Fund, in turn, responds that it did not include probationary employees and that it applied the same contribution schedule for 2015–16 that it applied for all other years, as it was required to do.  *See generally* Dkt. 60.

As explained below, the Fund has the better of both arguments and, accordingly, the Court will **GRANT** the Fund's motion for summary judgment without limitation.

## I. BACKGROUND

This case concerns ERISA's regulations of "multiemployer pension plans," in which "multiple employers pool contributions into a single fund that pays benefits to covered retirees who [have] spent a certain amount of time working for one or more of the contributing employers."  *SEIU Nat'l Indus. Pension Fund v. Castle Hill Healthcare Providers, LLC*, No. 17-cv-1666, 2019 WL 1429536, at *1 (D.D.C. Mar. 30, 2019) (quoting *Trustees of Local 138 Pension Trust Fund v. F.W. Honerkamp Co.*, 692 F.3d 127, 129 (2d Cir. 2012)).  As relevant here, ERISA requires that employers make contributions to such plans "in accordance with the terms and conditions" of the multiemployer pension plan itself or the CBA covering the plan.  29 U.S.C. § 1145.  In this manner, ERISA "makes a federal obligation of an employer's contractual commitment to contribute to a multiemployer pension fund."  *Flynn v. R.C. Tile*, 353 F.3d 953, 958 (D.C. Cir. 2004).

In 2006, Congress amended ERISA through the Pension Protection Act ("PPA"), Pub. L. No. 109-280, 120 Stat. 780.  Under the PPA, the actuary of a multiemployer pension plan must assess the plan's financial health and, if the plan fails to satisfy certain criteria, certify "to the Secretary of the Treasury and to the plan sponsor" that the plan is "endangered," "seriously endangered," or in "critical status."  29 U.S.C. § 1085(b).  The "plan sponsor" of a plan in

"critical status" must "adopt and implement" a "rehabilitation plan," *id.* § 1085(a)(2), and, after its adoption, "provide to the bargaining parties [one] or more schedules showing revised benefit structures, revised contribution structures, or both, which, if adopted, may reasonably be expected to enable the multiemployer plan to emerge from critical status," *id.* § 1085(e)(1)(B)(i). One of those schedules is "designated as the default schedule," which assumes that "there are no increases in contributions under the plan other than [those] necessary to emerge from critical status after future benefit accruals and other benefits . . . have been reduced to the maximum extent permitted by law." *Id.* § 1085(e)(1).

ERISA thus contemplates that parties may agree to adopt either the default schedule or, if they so choose, a different schedule proposed in the rehabilitation plan for supplemental contributions through collective bargaining. But the statute also addresses how to proceed if the parties cannot come to an agreement. Pursuant to the amendments contained in the Multiemployer Pension Reform Act of 2014 ("MPRA"), Pub. L. No. 113-235, Div. O, 128 Stat. 2130, 2773–2822, "if a [CBA] is in place at the time a plan enters critical status and then expires, and the parties are unable to reach agreement on a contribution schedule, the employer will be required to make contributions pursuant to the default schedule," *Castle Hill*, 2019 WL 1429536, at *2 (citing 29 U.S.C. § 1085(e)(3)(C)(i)). If, on the other hand, the parties initially *do* agree on an alternative contribution schedule and include that schedule in a CBA which then "expires while the plan is still in critical status," *id.* (quoting 29 U.S.C. § 1085(e)(3)(C)(ii)), but the parties *do not* reach agreement on a further contribution schedule following the expiration of the CBA, ERISA provides that "the contribution schedule applicable under the expired [CBA], as updated and in effect on the date the [CBA] expires, shall be implemented by the plan sponsor,' beginning on 'the date which is 180 days after the date on which the [CBA] . . . expired,'" *id.*

(citation modified and final alteration in original) (first quoting 29 U.S.C. § 1085(e)(3)(C)(ii); and then quoting 29 U.S.C. § 1085(e)(3)(C)(iii)).  "Any failure to make a contribution under a schedule of contribution rates [established under this provision] shall be treated as a delinquent contribution . . . and shall be enforceable as such."  29 U.S.C. § 1085(e)(3)(C)(iv).

The dispute in this case centers on the relationship between the Plaintiff Fund, a multiemployer pension plan, and Defendant Hamilton Park, a contributing employer to the Fund. Dkt. 55-3 at 1 (Pl.'s SUMF ¶¶ 1–3).  The Union entered a CBA with Hamilton Park Healthcare Center, LTD.—a predecessor in interest to Defendant—which originally ran from March 13, 2008, to February 28, 2013, *see* Dkt. 55-6, and was then extended by a 2012 arbitration award (the "Scheinman Award") through June 30, 2016, Dkt. 55-3 at 2 (Pl.'s SUMF ¶ 6); *see* Dkt. 55-7. In December 2012, Defendant purchased Hamilton Park Healthcare Center, LTD., and, in April 2013, agreed to be bound by both the 2008 CBA and the Scheinman Award, which, in effect, extended and modified the CBA.  Dkt. 55-3 at 2–3 (Pl.'s SUMF ¶ 7); *see* Dkt. 55-8.  The CBA thus required Defendant Hamilton Park to make monthly contributions, amounting to 2.75% of the gross earnings of the covered employees, from the covered employees' ninetieth day of employment, as well as any required supplemental contributions.  Dkt. 55-3 at 3 (Pl.'s SUMF ¶¶ 9–10).  Under the CBA, Defendant also agreed to be bound by the Fund's separate "Trust Agreement."  *Id.* at 4 (Pl.'s SUMF ¶ 19); *see* Dkt. 55-9.  The CBA, as extended by the Scheinman Award, expired on June 30, 2016, Dkt. 55-3 at 4 (Pl.'s SUMF ¶ 17), and Hamilton Park ultimately withdrew from the Fund in 2022, *id.* (Pl.'s SUMF ¶ 18).

The Fund was in "critical status" for every plan year between 2009 and 2022.  *Id.* at 5 (Pl.'s SUMF ¶ 23).  The Fund, accordingly, established the rehabilitation plan ("Rehabilitation Plan") required by ERISA and notified Hamilton Park and the other participating employers of

their obligations in November 2009.  *Id.* (Pl.'s SUMF ¶ 24).  The Rehabilitation Plan included

both a "default" ("Default Schedule") and a "preferred" schedule ("Preferred Schedule") for

supplemental contributions and benefit reductions intended to return the Fund to financial health.

Dkt. 55-2 at 6.  Pursuant to the Scheinman Award, Hamilton Park agreed to the Preferred

Schedule of the Rehabilitation Plan, at least in part.  Dkt. 55-3 at 6 (Pl.'s SUMF ¶ 26); Dkt. 55-7

at 21.  The Preferred Schedule included the following, escalating supplemental contribution rates

for employers:

| Year | Rate |
|------|------|
| 2010 | 10% |
| 2011 | 18.5% |
| 2012 | 27.7% |
| 2013 | 37.6% |
| 2014 | 48.3% |
| 2015 | 59.8% |
| 2016 | 72.1% |
| 2017 | 85.5% |
| 2018 | 99.9% |
| 2019 | 115.4% |
| 2020 | 132.0% |
| 2021 | 150.0% |
| 2022 | 169.4% |

Dkt. 55-12 at 14.[1]  The Scheinman Award (completed in 2012) expressly incorporated the

relevant contribution rates for 2012 (27.7%), 2013 (37.6%), and 2014 (48.3%) from the Preferred

Schedule, requiring that "in accordance with the Pension Fund Preferred Schedule, the Employer

---

[1] Those figures (including, specifically, the 18.5% supplemental contribution rate for 2011) represent the rates under the Preferred Scheduled in the event that the bargaining parties adopted the Preferred Schedule in 2010 or 2011.  Dkt. 55-12 at 14.  Although the parties' briefs do not fully address the issue, Defendant appears to have first adopted the Preferred Schedule in 2012, through the Scheinman Award.  *See* Dkt. 55-7.  The distinction does not matter, however, because the supplemental contribution rates for 2012 and the following years—the period in dispute in this case—are identical regardless of whether the bargaining parties adopted the Preferred Scheduled in 2010, 2011, or 2012.  Dkt. 55-12 at 14.

shall contribute to the Fund" supplemental contributions of those amounts in those years.  Dkt. 55-7 at 21.  The Scheinman Award did not expressly set a specific contribution rate for any year after 2014.  *Id*.  The Award did, however, provide the Union (but not Hamilton Park) with the right "to reopen and negotiate wages" 120 days before June 30, 2015.  *Id*. at 15–16.  The Union did not exercise that right, which, in any event, seemed to address wages rather than supplemental contributions.  *Id.*

Plaintiffs filed this suit in 2019, alleging that "[d]uring the period of May 2013 through the present, Defendant . . . failed to remit certain contractually required reports and contributions and . . . failed to pay certain interest charges, liquidated damages, and surcharges and supplemental contributions due under the PPA to the [Fund]."  Dkt. 1 at 7 (Compl. ¶ 24).  The complaint asserts two claims: first, that Hamilton Park has failed to pay required contributions as calculated by a payroll audit, an amount that Plaintiffs allege exceeds $100,000 for 2013–15 alone, *id.* at 8–9 (Compl. ¶¶ 25–32), and second, that Hamilton Park has generally failed to "provide remittance reports and contributions" as required by the CBA, *id.* at 9–10 (Compl. ¶¶ 33–40).  Plaintiffs request declaratory relief, judgment for the $109,988.01 owed for 2013–15, and judgment for further "unpaid delinquent contributions, interest, liquidated damages, and PPA supplemental contributions for the period of May 2013 through the resolution of this litigation."  *Id.* at 10–11 (Compl.).

After Defendant answered the complaint, *see* Dkt. 4, and the case proceeded to discovery, the parties moved to refer the case for mediation, *see* Dkt. 18, which the Court granted, Min. Order (May 26, 2021).  After the first round of mediation failed and following additional discovery, the parties attempted once again to mediate the dispute.  *See* Dkt. 41.  That effort also proved unsuccessful, and, accordingly, Plaintiffs have now moved for summary judgment.  *See*

Dkt. 55.  Plaintiffs argue that, at this stage, Hamilton Park's delinquency and total amount of

owed arrears are uncontested, based on the Fund's analysis of payroll data provided by Hamilton

Park itself.  Dkt. 55-2 at 13–14; *see* Dkt. 55-14.  Hamilton Park does not dispute much of

Plaintiffs' motion.  *See* Dkt. 58.  It does, however, maintain that Plaintiffs have mistakenly

included "probationary employees" in their damages calculations, *id.* at 5, and that "a genuine

issue of material fact exists as to the supplemental contribution rates applicable to the fourth year

of the Scheinman Award," *id.* at 7.  The parties' narrowed dispute is now before the Court.

## II.  LEGAL STANDARD

To prevail on a motion for summary judgment, the moving party bears the burden of

demonstrating "that there is no genuine dispute as to any material fact and [that it] is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it is capable of

affecting the outcome of the litigation.  *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006);

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if the

evidence is such that a reasonable jury could return a verdict for the non-moving party.  *See Scott*

*v. Harris*, 550 U.S. 372, 380 (2007).  In considering a motion for summary judgment, the Court

must resolve all factual disputes and draw "all justifiable inferences" in favor of the non-moving

party.  *Liberty Lobby*, 477 U.S. at 255; *see also Mastro v. Pepco*, 447 F.3d 843, 850 (D.C. Cir.

2006).

The non-moving party's opposition must consist of more than mere allegations or

denials; instead, it must be supported by affidavits, declarations, or other competent evidence,

setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e);

*Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  "[T]he moving party is entitled to judgment

as a matter of law if the non[-]moving party fails to make a showing sufficient to establish the

existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial." *Eddington v. U.S. Dep't of Def.*, 35 F.4th 833, 836–37 (D.C. Cir. 2022) (citation modified and third and fourth alterations in original). If the non-moving party's evidence is "merely colorable" or "not significantly probative," the Court should grant summary judgment. *Liberty Lobby*, 477 U.S. at 249–50.

## III. ANALYSIS

Hamilton Park's opposition to Plaintiffs' motion for summary judgment does not dispute, as a general matter, that Hamilton Park was bound by the relevant contractual agreements and therefore liable for unpaid contributions to the fund. *See generally* Dkt. 58. Nor does Hamilton Park dispute that Plaintiffs' have applied the correct supplemental contribution rates for most years as to most employees. *Id.* Hamilton Park does, however, dispute Plaintiffs' estimated damages calculations on two grounds.

### A.    Probationary Employees

The first question concerns Plaintiffs' treatment of "probationary employees" who worked fewer than 90 days. *Id.* at 5. Hamilton Park argues that Plaintiffs' damages calculations failed to "account for the exclusion of this category of employees" even though, as both parties agree, the relevant provision of the Scheinman Award only obliges Defendant to pay contributions to the Fund for employees who had worked at least 90 days. *Id.*; *see also* Dkt. 55-7 at 21. Hamilton Park thus asserts that a "genuine issue[] of material fact persist[s]" as to whether Plaintiff's damages calculations are accurate. Dkt. 58 at 6.

Hamilton Park has failed to show that a genuine dispute of fact forestalls summary judgment on this issue. Plaintiffs' estimate of the damages owed in this case is based on spreadsheets provided by Hamilton Park, which "detail[] the gross earnings of each *covered employee* for each month from May 2013 through December 2020." Dkt. 55-5 at 2 (Goodwin

8

Decl. ¶ 5) (emphasis added).  Caitlin Cooper Goodwin, a paralegal for Plaintiffs' counsel, attests (1) that these spreadsheets, created and provided by Hamilton Park, "included a breakdown of the gross earnings for each employee into eligible and ineligible earnings pursuant to the CBA" and (2) that "earnings marked ineligible by the Defendant" were not included in the damages calculus.  *Id.* (Goodwin Decl. ¶ 7).  This evidence, including a declaration submitted under the penalty of perjury, satisfies Plaintiffs' burden of proffering evidence sufficient to support their calculation of the damages and that Plaintiffs included only CBA-eligible earnings for covered employees in that calculation.  Plaintiffs have, accordingly, carried their burden on summary judgment of "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which [they] believe[] demonstrate the absence of a genuine issue of material fact."  *Celotex Corp.*, 477 U.S. at 323 (citation modified).

Because Plaintiffs have cleared that hurdle, "the burden shifts to [Hamilton Park] to set forth specific facts showing that there is a genuine issue for trial."  *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (citation modified).  It has not done so.  In its response to Plaintiff's statement of undisputed material facts—which represents that Plaintiffs calculated the amounts owed using spreadsheets provided by Defendant in the manner discussed above, and cites to supporting evidence, Dkt. 55-3 at 8–9 (Pl.'s SUMF ¶¶ 33–35)—Hamilton Park denies that the damages were properly calculated, but it fails to cite to *any* controverting evidence.  Dkt. 58-2 at 5–6 (Def.'s Resp. to Pl.'s SUMF ¶¶ 33–42).  Instead, Hamilton Park merely cites to its own counterstatement of undisputed facts, which asserts—without explanation—that "Plaintiffs' assessment does not account for the exclusion of [probationary] employees from their damages calculations."  Dkt. 58-3 at 1 (Def.'s SUMF ¶ 2).  The only support that Hamilton Park offers in

9

support of that nebulous assertion is a "*see generally*" citation to the Goodwin Declaration, which supports just the opposite proposition. *Id.* Nor does Hamilton Park identify any particular portion of the Goodwin Declaration that, it believes, creates a genuine dispute of fact as to whether Plaintiffs' calculations properly exempted probationary employees.

As Plaintiffs note, Dkt. 60 at 5, Defendant's submission does not accord with this Court's Local Rules, which require that a statement of genuine issues opposing a motion for summary judgment "shall include references to *the parts of the record* relied on to support the statement," LCvR 7(h)(1) (emphasis added). And, more significantly, it does not fulfill Defendant's obligation under Federal Rule 56 to "cit[e] to *particular parts of materials in the record*" to demonstrate that a fact is "genuinely disputed." Fed. R. Civ. P. 56(c)(1)(A) (emphasis added). Hamilton Park does not identify any "part" of the Goodwin Declaration that it submits would allow a reasonable jury to conclude that Plaintiffs' calculations included probationary employees; to the contrary, Goodwin attests that Plaintiffs included only "eligible" earnings from "covered" employees. Dkt. 55-5 at 2 (Goodwin Decl. ¶¶ 5–7). Nor does Hamilton Park's brief in opposition include any citations to record evidence that might controvert Goodwin's testimony. Dkt. 58 at 5–6. Although it could easily do so if warranted by the facts, Hamilton Park does not proffer its own declaration attesting that Plaintiffs' figures (or the payroll data on which Plaintiffs relied) included ineligible earnings for non-covered probationary employees, or otherwise identify any probationary employee for whom Plaintiffs seek contributions. This failure is all the more notable because it is uncontested that Plaintiffs relied on payroll data from Hamilton Park itself in calculating the damages owed. If the figures provided by Hamilton Park included probationary employees and their earnings were then included in Plaintiffs' damages

calculations, Hamilton Park could easily rebut Plaintiffs' evidence.  It has not even attempted to do so.

The Court will therefore grant summary judgment to Plaintiffs on the question of whether their damages estimate improperly includes data for probationary employees.

**B.      Annual Contribution Rates**

The second, more substantial objection raised by Hamilton Park concerns the selection of the appropriate supplemental contribution rate to calculate its arrears.  This issue turns on the relationship between ERISA's provisions and the parties' contractual obligations.

The Court begins with the contractual requirements.  As discussed above, after the Fund's actuary determined that the Fund was in "critical status," the Fund's Trustees created a "Preferred Schedule" for supplemental contributions at the following rates:

| Year | Rate |
|------|------|
| 2010 | 10% |
| 2011 | 18.5% |
| 2012 | 27.7% |
| 2013 | 37.6% |
| 2014 | 48.3% |
| 2015 | 59.8% |
| 2016 | 72.1% |
| 2017 | 85.5% |
| 2018 | 99.9% |
| 2019 | 115.4% |
| 2020 | 132.0% |
| 2021 | 150.0% |
| 2022 | 169.4% |

Dkt. 55-12 at 14.  The 2012 Scheinman Award extended and modified the CBA/SEIU National Industry Pension Fund to provide that, "*in accordance with the Pension Fund Preferred Schedule*, [Hamilton Park] shall" make supplemental contributions at a rate of 27.7% "[e]ffective July 1, 2012;" at a rate of 37.6% "[e]ffective July 1, 2013;" and at a rate of 48.3% "[e]ffective July 1, 2014."  Dkt. 55-7 at 20–21 (emphasis added).  Although the Scheinman Award did not

expire until June 30, 2016, *id.* at 22, it did not specify a supplemental contribution rate for the year beginning July 1, 2015, even though the Scheinman Award remained in effect during that year. Instead, the Scheinman Award gave the Union—and the Union alone—a "reopener" right, which allowed the Union, during the 120-day period preceding June 30, 2015, to "reopen and negotiate wages . . . , hours[,] and general terms and conditions of employment, to be effective for the final year of this Agreement." *Id.* "[T]here [is] no evidence that the parties' availed themselves of the reopener provision at all," Dkt. 55-2 at 13, and, as a result, the CBA between the Union and Hamilton Park, as extended by the Scheinman Award, expired on June 30, 2016, Dkt. 55-3 at 4 (Pl.'s SUMF ¶ 17).

Next, the relevant statutory provisions. ERISA, as modified by the MPRA, provides that if the bargaining parties agree to "a [CBA] providing for contributions under a multiemployer plan in accordance with a schedule provided by the plan sponsor," and if the CBA then "expires while the plan is still in critical status," as happened here, "then the contribution schedule applicable under the expired [CBA], as updated and in effect on the date the [CBA] expires, shall be implemented by the plan sponsor beginning [180 days after the CBA expires]." 29 U.S.C. § 1085(e)(3)(C)(ii).

Relying on this provision, Plaintiffs calculate the relevant supplemental contribution rates owed by Defendant as follows. For the years beginning July 1 of 2012, 2013, and 2014, the supplemental rates would be 27.7%, 37.6%, and 48.3%, respectively, as explicitly required by the Scheinman Award. Dkt. 55-3 at 7 (Pl.'s SUMF ¶ 29). For the year beginning July 1, 2015— when the Scheinman Award was still in effect but did not specify a contribution rate—Plaintiffs apply the Preferred Schedule's 59.8% rate, which, they argue, the Scheinman Award adopted (absent any further agreement by the parties). *Id.* Once the Scheinman Award expired on June

30, 2016, that same rate remained in effect until January 1, 2017, 180 days following the Scheinman Award's expiration, when, as required by ERISA, "the contribution schedule applicable under the expired [CBA]," as determined by the applicable "schedule provided by the plan sponsor," 29 U.S.C. § 1085(e)(3)(C)(ii), once again kicked in, Dkt. 55-3 at 7 (Pl.'s SUMF ¶ 29). Then, for each subsequent year, the corresponding rate from the Preferred Schedule would apply beginning on January 1, *id*. at 7–8 (Pl.'s SUMF ¶ 29), until Hamilton Park's withdrawal from the fund in 2022, *id.* at 4 (Pl.'s SUMF ¶ 18).

For the most part, Hamilton Park does not dispute this line of reasoning. It does, however, challenge Plaintiffs' calculation for "the fourth year of the Scheinman Award," Dkt. 58 at 7, that is, for the year beginning July 1, 2015, during which the Scheinman Award remained in operation but did not explicitly provide a supplemental contribution rate. As to that year, Hamilton Park maintains that there is a material dispute of fact as to which supplemental contribution rate the bargaining parties intended to apply. But notably, Hamilton Park fails to offer any reason grounded in ERISA or the CBA that would support application of an alternative rate than that set forth in the Preferred Schedule; it simply asserts, without support, that "nothing in the record . . . suggest[s] that" the rate in effect for the third year "would not have applied" to the fourth year as well. *Id.* Plaintiffs' position, in contrast, finds support in the facts and law.

To start, Plaintiffs correctly observe that the Scheinman Award referenced the Rehabilitation Plan, Dkt. 55-7 at 20, and expressly adopted the Preferred Schedule for the first three years, *id*. at 21. Although the Award did not specify the supplemental contribution rate for the fourth year, perhaps because the Union retained a right to reopen negotiations, Plaintiffs stress that the Rehabilitation Plan adopted by the Plan's Trustees requires that the annual rates of the Preferred Schedule, once adopted, automatically apply each year without further action by

13

the parties.  Dkt. 55-2 at 11; *see also* Dkt. 55-12 at 9 ("Notwithstanding subsequent changes in benefit and contribution schedules, a schedule provided by the Trustees and relied upon by the bargaining parties in negotiating a [CBA] shall remain in effect for the duration of that [CBA]."). Defendant responds that the Rehabilitation Plan's further provision that any supplemental contribution increases be included in a new CBA implicitly demonstrates that the parties assumed it would at least be possible for the parties to have agreed to a different rate for the 2015 Plan Year.  Dkt. 58 at 7.  The Court addressed a similar dispute in the *Castle Hill* case and, unsurprisingly, both parties claim that that decision favors their preferred interpretation here.

In *Castle Hill*, the same Plaintiff Fund sought unpaid supplemental contributions from a different participating employer, Castle Hill Healthcare Providers, LLC.  2019 WL 1429536, at *1.  In 2010, the relevant union and Castle Hill had agreed to extend their CBA through March 2014 and "agreed to the increased contribution rates set forth in the Preferred Schedule for the annual periods running from April 1, 2010, 2011, and 2012 to March 31 of each of the following years."  *Id.* at *3.  The bargaining parties did not, however, expressly include a supplemental contribution rate for the April 1, 2013–March 31, 2014, year, even though the CBA remained in effect for that year, and instead merely agreed "to re-open the contract for the purpose of negotiating pension fund contributions on or about September 1, 2012[,] for it to be effective April 1, 2013."  *Id.* (citation modified).  When the time came for the parties to negotiate a new contract, they were unable to come to agreement.  *Id.*  The Fund, as a result, argued that Castle Hill was required to make supplemental contributions in accordance with the Preferred Schedule for every year at issue.  *Id.* at *5.  Castle Hill objected that the parties' 2010 agreement "merely set the supplemental contribution rates for the annual periods beginning April 1, 2010, April 1,

2011, and April 1, 2012," and that, for the unspecified year beginning April 1, 2013, the parties had only agreed to negotiate an applicable contribution rate at a later time.  *Id.*

The Court "ha[d] little trouble concluding that the bargaining parties agreed to adopt the Preferred Schedule, at least for the first three years of the term of the 2010 [agreement]."  *Id.* Accordingly, given that the parties' CBA expired on March 31, 2014, when the Fund remained in critical status, ERISA would have required that the Preferred Schedule, as the "schedule" agreed to in the CBA, remain in effect beginning 180 days after the expiration of the CBA.  *Id.* at *5–6 (citing 29 U.S.C. § 1085(e)(3)(C)(ii)).  One minor difficulty, as the Court explained, was that the relevant provision of ERISA, as amended by the MPRA, "had an implementation date of December 31, 2014," and thus did not apply when the CBA expired in March 2014.  *Id.* at *6 (citing 26 U.S.C. § 432 note).  As a result, had the parties in the 2010 agreement decided to apply the Preferred Schedule through the CBA's expiration in March 2014, "the Court could conclude that Castle Hill was required to make supplemental payments under that schedule—first under the terms of the [2010 agreement] and then, starting January 1, 2015, pursuant to [ERISA]."  *Id.* "The problem with this explication, however, [was] that the 2010 [agreement] left the contribution rate for the final year of its term—from April 1, 2013 through March 31, 2014— unresolved."  *Id.*

That ambiguity, as the Court explained, presented two possible solutions.  The first, as advocated by the Fund, was that the parties' adoption of the Preferred Schedule for the first 3 years covered by the 2010 agreement necessarily meant that they also agreed to adopt the Preferred Schedule for the fourth year as well.  *Id.*  The second possibility, however, was that the 2010 agreement adopted the Preferred Schedule's rates only for the years between April 2010

15

and March 2013, and that a different, unspecified rate "would apply for the period from April 1, 2013[,] through March 31, 2014." *Id.* at \*8.

The Court concluded that it was unable to adopt the Fund's preferred interpretation at the summary judgment stage for two reasons. First, "nothing contained in the Fund's—or Castle Hill's—briefing and evidence explain[ed] what the bargaining parties thought they were doing when they did not adopt a supplemental contribution rate for the last year of the [CBA] and, instead, agreed to re-open the contract." *Id.* at \*7 (citation modified). Although it was possible that—as a matter of law—the parties, having adopted the Preferred Schedule for the first three years, had no choice but to also adopt it for the fourth, "the Fund ha[d] failed to identify the statutory provision or term of the Trust Agreement that support[ed] that conclusion." *Id.* Second, although it was possible that—as a matter of fact—"the bargaining parties adopted the Preferred Schedule for all four years that the [2010 agreement] was in effect," the Fund had "fail[ed] to identify any competent evidence addressing this issue beyond the language of the [2010 agreement]." *Id.* "Either way, the Court lack[ed] sufficient basis to enter summary judgment on the present record." *Id.* In short, the law and facts were not sufficiently developed in the parties' submissions to permit the Court to resolve the question.

Hamilton Park argues that a similar ambiguity prevents the Court from granting the Fund's motion for summary judgment in this case. "Just like in [*Castle Hill*], a genuine issue of material fact exists regarding which supplemental rates applied after the third year of the [CBA]," because the Scheinman Award did not include a specific rate for that year and, instead, "included a reopener provision in the Award for its last (or fourth) year." Dkt. 58 at 6. Here, however, unlike in *Castle Hill*, Plaintiffs point to language in the Rehabilitation Plan requiring that an adopted schedule "compound[] each year" and "remain in effect for the duration of [a

16

CBA]" if "relied upon by the bargaining parties in negotiating a [CBA]"  Dkt. 55-2 at 11 (quoting Dkt. 55-12 at 9, 13).  Plaintiffs also, unlike in *Castle Hill*, note that, under relevant ERISA precedent, the intent of the parties is immaterial where the language of the CBA is clear. *Id.* at 12 (citing *Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.*, 118 F.3d 1018, 1021 (4th Cir. 1997)).  Finally, to the extent that the Scheinman Award's reopener provision *might* have permitted the parties to adopt supplemental contribution rates for 2015–16 other than those included in the Preferred Schedule, Plaintiffs assert that such a possibility is irrelevant on the facts of this case, since it is uncontested that the Union did not, in fact, reopen the contract or agree to any other rates.  Dkt. 60 at 7–8.

Plaintiffs have the better argument.  Under ERISA, the Fund was required to adopt a rehabilitation plan, 29 U.S.C. § 1085(e)(1), and that plan needed to "provide to the bargaining parties [one] or more schedules showing revised benefit structures, revised contribution structures, or both, which, if adopted, may reasonably be expected to enable the multiemployer plan to emerge from critical status in accordance with the rehabilitation plan," *id.* § 1085(e)(1)(B)(i). ERISA further provides that "[a]ny failure to make a contribution under a schedule of contribution rates provided under this subsection shall be treated as a delinquent contribution . . . and shall be enforceable as such."  *Id.* § 1085(e)(3)(C)(iv).  The only schedule for supplemental contributions referenced in the Scheinman Award, in turn, was the Preferred Schedule.  To be sure, the Award did not expressly specify a supplemental contribution rate for 2015, but the Rehabilitation Plan undercuts Hamilton Park's effort to turn this omission into a material dispute of fact for trial; it provides that "[n]otwithstanding subsequent changes in benefit and contribution schedules, a schedule provided by the Trustees and relied upon by the bargaining parties in negotiating a [CBA] shall remain in effect for the duration of that [CBA],"

17

Dkt. 55-12 at 9.  That language, moreover, merely repeats what ERISA requires:  "A schedule of contribution rates provided by the plan sponsor and relied upon by bargaining parties in negotiating a [CBA] shall remain in effect for the duration of that [CBA]."  29 U.S.C. § 1085(e)(3)(B)(iii).

The Court does not understand Hamilton Park to dispute that the Preferred Schedule constitutes a "schedule" within the meaning of the Rehabilitation Plan and ERISA, or that the bargaining parties relied on the Preferred Schedule in negotiating the CBA, through the Scheinman Award, which expressly required the employer to make contributions "in accordance with the Pension Fund Preferred Schedule" contained in the Rehabilitation Plan.  Dkt. 55-7 at 21.  Hamilton Park offers no response to this line of reasoning.  *See generally* Dkt. 58.  Instead, it merely argues that a separate provision of the Rehabilitation Plan "require[s] supplemental contribution increases be included in new [CBAs]" and suggests that Plaintiffs' argument that the Rehabilitation Plan required the Preferred Schedule apply for every year of the CBA would make that provision regarding supplemental contribution increases superfluous.  *Id.* at 6–7.  It does not, however, identify which specific provision of the Rehabilitation Plan it believes requires inclusion of subsequent contribution rates in CBAs or explain how such a provision could trump the requirement that a contribution schedule provided by the plan sponsor and relied upon by the bargaining parties remain in effect for the duration of the CBA.  *Id.*; *see also* Dkt. 58-3 at 1 (Def.'s SUMF ¶ 1) (citing Dkt. 55-12).

In their reply brief, Plaintiffs speculate the Hamilton Park might be referring to the provision of the Rehabilitation Plan specifying that "the amount [of supplemental contributions] in the tables below is the amount to be included in your CBA for each year."  Dkt. 60 at 7 (quoting Dkt. 55-12 at 13).  Assuming that Plaintiffs are correct—and the Court does not see an

alternative provision which Hamilton Park might intend to reference—the Court agrees with Plaintiffs that this language does not contradict or diminish the Rehabilitation Plan's (much less ERISA's) separate requirement that a schedule relied on when negotiating a CBA remain in effect throughout that CBA's term.  *See* Dkt. 60 at 7; *see also* 29 U.S.C. § 1085(e)(3)(B)(iii). Nor does the Court understand that the CBA's inclusion of a provision permitting the Union to reopen negotiations and at least arguably negotiate a different contribution rate for the year at issue to be relevant where, as here, it is undisputed that the parties did no such thing.  *Cf.* Dkt. 58 at 7.

Because Plaintiffs have carried their burden of demonstrating that the contribution rate specified for 2015 in the Preferred Schedule is controlling, and because Hamilton Park has failed to offer evidence sufficient to permit a reasonable factfinder to conclude that the Rehabilitation Plan and the Scheinman Award contemplate any alternative supplemental contribution rate for the year beginning July 1, 2015, the Court will grant summary judgment to Plaintiffs on this issue as well.

## C.    Damages Calculation

The questions discussed above are the sole grounds on which Hamilton Park disputes Plaintiffs' motion for summary judgment.  However, even where the damages are not contested by a party, the Court still has an independent obligation to determine "the sum to be awarded in the judgment unless the amount of damages is certain."  *Int'l Painters and Allied Trades Indus. Pension Fund v. Auxier Drywall, LLC*, 531 F. Supp. 2d 56, 57 (D.D.C. 2008).  And, although Hamilton Park does not otherwise dispute Plaintiffs' claimed damages, it does attach to its opposition the Court's decision in *SEIU Nat'l Indus. Pension Fund v. Hamilton Park Health Care Ctr., Ltd.,* No. 14-cv-84, 2016 WL 183505 (D.D.C. Jan. 14, 2016).  Dkt. 58-1 at 4–13.  In that case, the Court determined that the spreadsheet submitted by the plaintiff fund in support of

its claimed damages was too "inscrutable and unhelpful" to permit the Court to enter judgment, as it failed to explain the basis for the fund's calculations. *Id.* at *2–5.

Here, in contrast, the Court discerns no similar defect in Plaintiffs' summary spreadsheet in this case, Dkt. 55-14 at 2, which adequately demonstrates the basis for Plaintiffs' calculation of Hamilton Park's arrears. As explained in the Goodwin Declaration, over the relevant period Hamilton Park paid a total of $560,118.79 into the fund, which was sufficient to cover the required total owed base contributions of $515,742.82 but far less than the amount required to also cover the required supplemental contributions of $393,657.80. *Id.*; Dkt. 55-5 at 3 (Goodwin Decl. ¶ 11). That resulted in total unpaid supplemental contributions of $349,281.83, on top of which Plaintiffs also seek interest and liquidated damages in accordance with the Fund's Trust Agreement and Collections Policy. Dkt. 55-5 at 6 (Goodwin Decl. ¶¶ 16–17).[2] Hamilton Park does not dispute that it agreed in the CBA to be bound by the Trust Agreement and, by extension, the Collections Policy. Dkt. 55-3 at 4 (Pl.'s SUMF ¶ 19); Dkt. 55-6 at 30; Dkt. 55-8 at 2. And the Goodwin Declaration adequately sets out the basis for Plaintiffs' application of the relevant terms of the Trust Agreement and Collections Policy to Hamilton Park's arrears.

---

[2] The Court notes that there are miniscule disparities, only amounting to a couple of cents, between the figures reported in the Goodwin Declaration and the estimates in Plaintiffs' summary spreadsheet. *Compare* Dkt. 55-5 at 3 (Goodwin Decl. ¶ 11), *with* Dkt. 55-14 at 2. Given the negligible difference between the numbers, the Court concludes that further briefing on the issue is not warranted. Instead, the Court will award damages based on the smallest reported figure of Defendant's unpaid contributions—$349,281.83—which is also the figure included in Goodwin's sworn declaration.

## CONCLUSION

For the foregoing reasons, the Court will **GRANT** Plaintiff's motion for summary judgment, Dkt. 55.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  March 12, 2026